Case number 14-1045 et al. SSC Mystic Operating Company LLC doing business as Pendleton Health and Rehabilitation Center Petitioner versus National Labor Relations Board. Mr. McGuire for the petitioner, Ms. Isbell for the respondent. Good morning. Good morning, Your Honors. May it please the Court, Michael McGuire and the law firm of Shaw and Rosenthal representing the petitioner, Mystic Operating doing business as Pendleton Nursing and Rehabilitation Center. This matter arises out of an NLRB election conducted at the Employers Nursing Home in Mystic, Connecticut on April 4, 2013. 104 employees voted. The count was 64 yes in favor of the union, 40 against. So if 12 of the 104 employees had changed their mind, the union would have lost in that election. With the Court's permission, after a brief statement of the facts, I would like to address the primary issues in a different order than we presented in our brief, starting first with the narrowest grounds for the Court to vacate the Board's order, which is the subpoena issue and this Court's recent decision at Ozark Automotive that was decided February 10, 2015. Then I will move on to what I would characterize as massive supervisory taint in this case by an undisputed supervisor doing undisputed bad acts. And the Board's doctrine, which we call into question the Harborside Doctrine, which says employer anti-union conduct will be evaluated the same way as employer pro-union conduct, as well as the theory from Harborside that assuming bad acts occur by a supervisor in favor of the union, if the employer does nothing to remediate, it waives the objection. If the employer does take actions to remediate, then it cures the objection, which presumably leaves only trying to do some remediation but failing as the only way that that objection still stands. And then finally, Your Honors, I was going to address the broader issue, which is that the Regional Director had no authority to conduct this election in the first place based on Laurel Bay and New Process Steel. So with regard to the subpoena issue, at the hearing we had nine employees, voters in the election, testify as to the gross misconduct by Supervisor Mackin, the undisputed supervisor. There was lots of testimony that she was acting in concert with the union's organizer, Jeff Welch. We crafted a very narrow subpoena to attempt to get the phone records between Mr. Welch and Ms. Mackin, no other employees, to demonstrate both the frequency and duration of their contacts in an effort to prove agency between the union and Ms. Mackin's clearly improper conduct. The union objected to the subpoena based on relevance and on it might disclose Section 7 activity of Ms. Mackin. Of course, in the end, she had no Section 7 rights because she was deemed to be a supervisor. The union was present at the hearing in their petition to revoke. Weren't the contacts sufficient to make out the point you wanted to make out? I mean, it's clear that they had contacts with one another. Wasn't that sufficient? It was clear they had contacts. The question of duration and frequency of contacts... Why didn't you subpoena the organizer? Your Honor, we had the opportunity to ask the organizer questions. He was not in the room. The hearing officer said she would produce them. But without the phone records to basically keep him honest with regard to his testimony to impeach, if necessary, for credibility reasons, we ended up never calling the organizer. That impeach for credibility reasons, a person that you never call, seems a rather poor excuse for not getting the evidence that you could have gotten that way. I'm a little troubled by the thought, well, we didn't get the records we wanted, therefore we didn't ask questions. It would seem to be the other way around. You had more incentives to question witnesses, didn't you? Your Honor, I believe that between the Indiana Hospital case from the Third Circuit, which is cited by the court in Ozark, it strongly suggests that we have the right to get the records first, to make trial determinations as to whether to call witnesses or what questions to ask the witnesses. Because quite frankly, if we only had Mr. Welsh and no records, he could say, he could minimize his contacts, he could say anything he wanted. Then you would have the possibility of arguing an impeachment. But when you have not even asked the question, let alone got the answers, it doesn't make your impeachment need look very compelling. Well, Your Honor, we could not have impeached without the records, and the hearing officer said she was not going to provide us with the records. Did you have that circumstance where the witness had testified and you were questioning his credibility and then asked for the records? You didn't have that because you didn't question, right? We never called Mr. Welsh as a witness. That's undisputed, Your Honor. We believe that under the Ozark case and the Third Circuit Indiana Hospital case, we were entitled to have those records in advance of the hearing or at the beginning of the hearing to make that determination. Can I ask a question on this issue from a different angle, which is that let's suppose that with respect to your other objection that you're raising concerning Macken's conduct as supervisor, that the hearing officer's decision that there was no prejudice from that is sustained. I know you disagree with that, but let's just suppose that that's true. And so there was no prejudice from her conduct that would cause her overturning the results. Then on this second objection, which deals with the appropriateness of the union conduct, the subpoena only goes to what Macken did vis-à-vis Welsh, right? So we're still talking about Macken. We're talking about Macken and Welsh. So if by hypothesis there was no prejudice as to Macken's conduct as supervisor, what prejudice is there from Macken's conduct as union agent? The prejudice is there is a lower bar to prove a violation if it is a party. Is there a lower bar for prejudice? I'm sorry. It's a lower bar for objectionable conduct. Right. But you still have to show prejudice as to the objection concerning a union use of an agent, right? It's not just that there's inappropriate conduct and ergo you win. There's still a prejudice component to that, I think. Well, we need to demonstrate that the conduct was of the type that would destroy the laboratory conditions for an election, which the hearing officer concluded it was. Macken's conduct was. The question is can we also attribute Macken's conduct to the union agent? I guess I'm asking a slightly different question, which is that if you have to show, I think, to prevail ultimately on this argument that there was prejudice vis-à-vis the election, that it actually has some consequence for the election, right? The conduct of Ms. Macken. Right. And so if we suppose that for the other objection that Macken's conduct as supervisor didn't have a prejudicial impact, what's the basis for thinking that Macken's conduct as union agent would have a prejudicial impact? It would only be, Your Honor, that conduct of a union agent is a lower bar to establishing objectionable conduct based on agency of the union. And if Macken is the union's agent, then her conduct is attributable to the union. Now, if you're saying, but if Macken's conduct was never prejudicial, then how could, if it's attributed to the union, have it been prejudicial? Right. Well, we obviously believe Macken's conduct was prejudicial. Right, but I'm just asking, I get that argument, which would mean that there's no, that would buy into the notion that there's no daylight between your two objections vis-à-vis the prejudicial impact of Macken's conduct. So if I disagree with you on that, just for arguments purposes, and I think that Macken's conduct as supervisor was non-prejudicial with respect to the outcome of the election, then I'm not seeing the basis for concluding that Macken's conduct as union agent was prejudicial. Well, I believe the argument would be, Your Honor, that if her polling of employees and her threats to employees were attributed to the union as an agent, because it is a lower bar to establish a violation by a party, the union, than it is to establish a violation by a third party, in this case a supervisor, normally it's a rank-and-file employee, that it would be prejudicial to us not to have the opportunity to raise it. But it sounds like it's, I think it's just a lower bar, if there is a lower bar. It's a lower bar as to whether the conduct is problematic, not a lower bar to determine whether there's been prejudice. You still have to show prejudice, and if the bar for showing prejudice is the same, I'm not seeing the daylight between those two objections vis-à-vis the essential prejudice component. Well, perhaps I'm not following Your Honor's question, but I believe that if the conduct of Macken can be attributed to the union, right, it then becomes prejudicial to the employer because the union is a party to the proceeding. I wonder about the order in which you're taking these questions up in this case. If you were correct on the Laurel Bay issue, we don't get to any of this. I don't see why you're starting at the back end of your argument progression. Are you abandoning the Laurel Bay argument? No, Your Honor, I was starting with the narrowest. We don't get to the narrowest if you're right about the Laurel Bay objection. So the Laurel Bay point, Your Honors, the pertinent question is, what statutory power did the NLRB have on April 4, 2013, to conduct this election? We respectfully submit that there was none. There was only one board member sitting on April 4, 2013, at the time that this election was conducted. But Laurel Bay dealt with the delegation of adjudicative authority, right, not administrative authority. It did. What the regional director does in certifying an election isn't quite the same as what the board does when it resolves the charge of an unfair labor practice, is it? I would say it is very similar. It's similar, but how? This was an adjudicatory proceeding. It was or was not? It was. The hearing officer made credibility resolutions, wrote the decision herself. The regional director was not involved at all in that proceeding other than delegating authority. But it wasn't the final determination, right? I mean, there's the right of an appeal from a regional director's decision, even if it's an adjudicative decision. That wasn't present in Laurel Bay, was it? Well, in this situation, exceptions were filed directly to the board from the hearing officer's decision. And that's always the case when we're dealing with the delegation of authority to a regional director, right? If the parties disagree with the way the regional director has conducted the election or the adjudication, they are entitled to take an appeal to the board. But in Laurel Bay, that wasn't the case, was it? I mean, it was a delegation of final authority. And that's a pretty significant difference, isn't it, when we're talking about agency principles, right? I do not believe so, Your Honor. Can the regional director really act with greater authority than the board? And in this case, there was no board authority. No, but just on this one issue, the regional director was not acting with final authority. The regional director could not bind the board, right? Because the regional director's decisions are subject to the board, correct? That is correct. In Laurel Bay, the delegated authority was final. It bound the board. That's a rather significant difference when one's talking about legal principles of agency law, isn't it? Well, I don't believe the holding in Laurel Bay necessarily ends up at that same point, Your Honor. I believe the holding of Laurel Bay says if you've got a board who is not functioning, then its delegations are not functioning either. The regional director cannot have a greater authority to run elections than the board could have because he is only acting on authority delegated by the board to him. And in this situation, as you know, it was – I'm just trying to point out the factual circumstances are really quite different. You're not hearing the significance of that distinction. Don't assume that everybody on the board is. Okay. Well, Judge Santel, I understand you've been at the epicenter of a number of these cases. I'm the forest gun employer. Well, can I ask this question? If the employer – if you never raise an objection on Laurel Bay slash Noel Canning grounds, would you agree that that kind of objection is forfeited? Your Honor, we objected on Laurel Bay, Noel Canning grounds at the very first opportunity. No, right, right. I'm not asking about what you in fact did. I'm just saying if you hadn't, if an employer does not raise an objection on those grounds, would you agree that that kind of objection is forfeitable? The case law says that the court can recognize extraordinary circumstances to recognize the objection, even if it were to come late. We could. We could. But I get that. And I think that the courts would have some inherent authority to reach down, even if they didn't have to. But I guess what I'm saying is the court would also have the authority to say that the objection has been waived. It would. And I hope you're not talking about our case because – I'm not talking about your case for the moment. But here's where I'm going with this question. If it's true that the objection can be waived by failure to raise it, then why isn't it also true that the objection can be waived by action of the parties? In other words, they agree with another party. They just say, you know, we're going to decide that we're going to give the election to the regional director. And that operates as a waiver. You could call it a stopple. You could call it whatever you want. But I guess if it's true that the party can waive it by failing to raise it, then why isn't it also true that the party can waive it by agreeing that it's going to go to the regional director? There's no opportunity to raise an objection on a Laurel Bay grounds at the time a petition is filed unless the employer does one of two things. It ignores the labor board and lets them run the election without them, which I guess was an option, or it runs into federal court, I suppose, seeking a temporary restraining order, declaratory judgment, that this court's decision in Laurel Bay should end any proceedings at all. That's strange. I guess maybe I'm wrong about calling it an anomaly, but that situation has prevailed with regard to all kinds of objections to representation elections. You don't get a chance to make your objection until after the physical process has concluded and you've made your stand by not voting. That's how the process always is. And we filed our objection immediately after the election. And I can't imagine that the labor board would really be suggesting employers ought to ignore the government and run into federal court and ask for TROs whenever they think the board is not acting properly. I'm not understanding that response because if a party can decide that, if a party can waive an objection by not raising it, why can't it enter into an agreement that just says we're going to give this election to the regional director, this person we're calling the regional director? That's just how this election is going to be conducted. And we, when you sign a stipulated election agreement, you do agree to a date, a time, a place for an election and an appropriate voting unit. There's no opportunity at that point to raise a fundamental objection on Laurel Bay, no authority granted. So what if the agreement said we're agreeing to allocate it to the regional director, regardless of whether the regional director is validly appointed? What if the parties actually agree to that? It's expressed on the four corners of the agreement. I suppose that could be waived, but that's certainly not what a stipulated election is. But then we're talking about whether it in fact was. I guess the first question is whether it could be. And if it could be by clear language, then the question becomes whether this did the work. But one of the arguments you're raising in your brief is that this type of thing can never be waived, regardless of what the parties do. And I guess I'm wondering whether that's in fact true. Well, we don't believe it can be waived by entering into a stipulated election agreement. Even if it had the language that I just said? I thought you just said that it could be waived. Have we ever seen a stipulated election agreement that had more than the base language? No. I think the stips are probably in the record. The stips haven't changed much in my 35 years of doing this. They're all pretty much alike. Yes. They don't have as much extraneous. But what if the parties did? The parties see that this kind of aggression is coming along the pike because they see what's happening with the identity board. So they say, you know, we're going to enter into this stipulated agreement to have the election conducted by a regional director. And actually, we understand that there's a looming issue about whether the board has the requisite quorum to delegate stuff to the regional director and whether that delegation from 1961 continues to persist. But we're just deciding that we don't care about that. And so they put it in. I don't see any. Why can't they just handwrite it into the agreement? They could. And it sounds to me like if they did do that, then it would affect a waiver. Your Honor, that's an interesting hypothetical. I believe it probably could be waived if it said all those things. The agreements don't. You know, the process for a million years has been you go through the proceedings and then you file objections at the first opportunity if you believe the proceedings were incorrectly or wrongfully carried out. My time is up, Your Honor. Can we have some more questions? So I have another set of questions along these lines. Your time may be up at ours. So there's another series of arguments in this case about Chevron deference. And at the time of Laurel Bay, as I understand it, the board did not raise a Chevron argument in Laurel Bay itself. I don't think Chevron ever came into the field of vision there because I don't believe the board claimed Chevron deference at Laurel Bay. Now the board is claiming Chevron deference based on the language that's in the decision that's under review. So is this an issue that just is unamenable to Chevron treatment, or do you just think that there's some problem with the instrument through which the board is claiming Chevron deference? I believe that the stipulated election agreement instrument does not address any of these issues, and no party would anticipate that the stipulated election agreement would have addressed an issue of authority of the regional director to conduct the election. Right, but later on in the ULP proceeding, the board issues a decision, and in the board's decision, it says that its interpretation of the statutory provisions is that this kind of delegation is okay. And the board is now in its brief claiming Chevron deference to that determination? I would simply say, Your Honor, the board has been claiming throughout the litigation of both the new process issue and the Noel Canning issue that they should be entitled to Chevron deference. Does the statutory text say anything about the duration of the delegation of the authority of the regional director? Does the statute address that at all? It did not. It was in 1961, as Your Honor knows. The delegation was in 1961. Isn't that a classic example where the statute doesn't address it specifically, that we then defer to agency reasonable interpretation? Well, I would believe that when you have, obviously, gaps in the board, as there have been several times, that the notion that the delegation goes on continually, even when there is no, as the court pointed out, chairman of the board, so to speak, to be running the corporation, that agency principles ought to say that it stops. Right, but the question is, is it within the zone of ambiguity so that the agency can dispose of the issue in a Chevron treatment? Why can't this be something that the agency resolves? Well, because I believe it's a fundamental authority issue, and I do not believe it would fall within the Chevron. But I thought the City of Arlington v. FCC stands for the proposition that agencies get Chevron deference when they speak to the question of their own authority under a statute. So it seems to me, unless for some reason City of Arlington doesn't apply here, it seems to me that under the Supreme Court's decision, City of Arlington v. FCC, that agencies are capable of getting Chevron deference when they speak to the scope of their own statutory authority. And so why this issue, it seems like it could be amenable to Chevron treatment. And then the question becomes, if so, why don't they get Chevron deference for their determination in the adjudication under review? I don't know if I can answer Your Honor's question other than to say what I've already said concerning our belief that this argument has been addressed previously, the Chevron deference argument, by... Isn't that the answer that the Supreme Court has already construed? The authority of the board was referenced to functioning without a quorum. Or in this circuit, we in Laurel Bay have said we've construed it, and therefore it is not a case for Chevron deference. This is not an ambiguity. This statute makes it plain that there is no such board during the interval when they don't have enough for a quorum. So therefore there's not a Chevron issue. Well, this court and the Supreme Court has certainly been consistent with regard to that. But I guess the reason why that didn't seem to apply, and I'll just put the question to you, is that the Supreme Court's decision doesn't deal with the issue in this case. You argue that. It's a different rationale. And Laurel Bay, as I read Laurel Bay, it would be one thing if Laurel Bay said the statute's absolutely unambiguous on this issue. Because if Laurel Bay says the statute's absolutely unambiguous on the issue, then there's no room left for the agency to exercise discretion and construe it differently. Because under another decision, Brand X, that's tantamount to a step one Chevron treatment. So the agency can't resolve it. But Laurel Bay said the issue was close. I think that's the exact words of the decision. And then Laurel Bay went on to say that the OLC interpretation on which the board premised its conduct wasn't clearly incorrect or worse to that effect. So then it seems like it's still within the zone as something that the agency can resolve. Because Laurel Bay didn't say that it's unambiguously the case. I would say that Laurel Bay and the Supreme Court have said that's a question for another day. And perhaps this is the day. Or this is the two weeks, because I know there was a case last week dealing with it, too. And you see health. Thank you. Thank you, Your Honor. Thank you very much. We'll give you back a couple minutes. May it please the Court, Kelly Isabella here on behalf of the National Labor Relations Board. On the issue of Chevron deference, since we're there, we believe the board is entitled to Chevron deference. We did not argue it in Laurel Bay because we relied on an OLC memo. And we agreed when we asked for the OLC's opinion that we would comply with their opinion. We did not think we deserved Chevron deference because we were not interpreting the National Labor Relations Act at that time. But then you asked for Chevron deference in the Supreme Court in new process. In new process. New process or no? In new process. In new process, did we? Yeah. And that would have been based on, I think, and that would have been based on the exact same thing that you just said wouldn't be entitled to Chevron deference. That is very interesting. But the reason we, I think, deserve Chevron deference here is because the delegations at issue are very different. The delegation in Laurel Bay in new process was about the board's delegation of its core function to decide and remedy unfair labor practices. The delegation that's at issue here is a delegation of representational authority to the regional directors based on Congress's decision in 1959 to amend the Act to allow the delegation and their determination that regional directors had the expertise to decide representation. But is there language in Laurel Bay that so limits its holding? Doesn't it paint with a broader brush than that? It could perhaps be read that way, but I don't think the issue of the regional directors' delegation was not at issue in Laurel Bay at all. Whenever Laurel Bay quotes the Act, it incites that. But there's nothing in Laurel Bay to say that it's limited to the ways that you're speaking of. There's no language in Laurel Bay that says it should be limited that way. Now, one can argue from inference, but it's a pretty tough argument to make, isn't it, in the face of Laurel Bay, which binds us. Except that there's been an intervening decision by the Supreme Court in new process. I thought you were going to say except that there's been an intervening decision by the board. Because why does Laurel Bay, unless Laurel Bay says the statute's unambiguous, why can't the agency construe the statute differently than Laurel Bay did? I thought that's the whole point of Brand X, that an agency can decide a statutory issue differently than a court did, as long as the court didn't say that the statute was unambiguous. The board can interpret the statute differently. I don't think that Laurel Bay decided this particular point, which is about the kind of delegation to the regional directors that is only Section 9. It does not involve what we call final orders, orders that can be enforced in a court. They're all preliminary orders issued by regional directors. But in Laurel Bay, there was a statutory decision. There was a holding based on the language of the statute. There was a holding based on agency law principles. And if the case had been decided on statutory basis alone, your argument's a good one. But it wasn't. In Laurel Bay, we went on to look at fundamental agency principles, and that's what I'm asking you to address. The language of Laurel Bay doesn't appear to be as limited to the facts of Laurel Bay. So how do you get around that? I think the board would point you to new process, where the court recognized that the two delegations, they didn't decide, we do not say they decided the issue because they did not, but they did point out that the two kinds of delegations are very different. That brings me to the question, then, does Laurel Bay remain binding presidential law in this circuit? Given that the Supreme Court did not reverse it and did not decide that issue, isn't Laurel Bay still circuit president? Laurel Bay is circuit president, but I would argue that Laurel Bay does not at all address the delegation to the regional directors, which is very different. And agency law, when you're in Laurel Bay, I'm not sure why it's different. I understand there's a distinction, but I'm not sure why there's a difference. If the board has no, possesses no authority to act, and we've held it can't delegate authority when it possesses no authority itself, how does it make a difference that the delegee is the regional director as opposed to the committee of the board? The board made its delegation, of course, when it did have authority to act back in 1961. Well, that's true of both cases. And the delegation in Laurel Bay was a process developed specifically to deal with an upcoming quorum problem. It was not the delegation that is part of Congress's intent in amending the act in 1959 to ensure that representation cases get processed on time and quickly. I mean, that's the purpose of the delegation in Section 3B to the regional directors. The delegation at issue in Laurel Bay was a delegation to ensure that the board could act when it didn't have enough members, and the Supreme Court said we couldn't do that. There's no indication in the process that the delegation to the, there's the opposite indication. But what are we supposed to do with the language of Laurel Bay that isn't so confined to the facts of the case or the purposes of the different delegations? The language of Laurel Bay sure sounds, it's almost, it's talking about sort of a metaphysical point, right? And that is when there is no quorum of a board, delegated authority evaporates. And that there's, the court there is specific. And all you're offering me thus far is, well, the facts were different. And to be sure they were different, but facts are always different. How do you deal with the metaphysical language of Laurel Bay? The common law discussion in Laurel Bay is incidental to the court's decision. It's not dicta, it was part of the holding. Are you arguing it's dicta? No, sir, I am not. What do you mean by it's incidental? I don't think that the decision, I don't think you need to rely on the discussion of the common law for the holding in Laurel Bay. The Supreme Court did not in due process say that the, all delegations end when the board loses a quorum. No, but it sure sounds like we said that in Laurel Bay. Forget new process. Just for sake of argument. I'm not persuaded by your new process argument. I'm looking at Laurel Bay, and I'm trying to decide what to do with the broad language of Laurel Bay. I think that the discussion of the common law in Laurel Bay is, I am sorry, Judge Sintel, incorrect. You're entitled to say that. But what you're not entitled to say is that if it's circuit law, we can abandon it. The panel can't abandon circuit law. I agree with you. I agree with you. We can say it, but it wouldn't have to be fixed. Can I bring you back to Chevron, though, on this question? Because let's suppose that Laurel Bay does directly address the question here. Let's just suppose it does. I know you contest that, but let's just engage in the hypothetical that it does. If Laurel Bay engages on the direct question here but then says, you know, I think it's really close. I'm not exactly sure which way the statute's better read, but my best reading of it is that it comes out against the board. And then the board goes through notice and comment rulemaking and issues a rule that says we read the statute to affect the opposite result. Can the agency not do that? I think the agency can do that. I'm not an administrative law expert, but I believe it can do that. Well, you're claiming Chevron in your brief, so you're at least an expert to that extent, I assume. Yes, we could make a rule. And then that would get Chevron treatment, deference, even though the court construed the statute differently. Is that your argument? That's correct, yes. So then aren't you making the same argument now vis-à-vis the adjudication? That, yeah, even if Laurel Bay did address the issue in this case, it didn't say that the statute was unambiguous. And unless it said the statute's unambiguous, the agency still has room to construe the statute, even if it disagrees with the interpretation that the court had in Laurel Bay. It wouldn't matter if the Supreme Court, as I understand it, it wouldn't matter if the Supreme Court read the statute in a particular way as long as it didn't think the statute was unambiguous. And the agency can come along and say, we've looked at the matter, and we think the statute is best read differently for whatever discretionary reasons the agency has to do that. Am I misunderstanding your argument, or is that? I don't think so, Your Honor. In the case of the regional director's decisions, as I've noted before, we do see that as very different than the delegation of the board's authority to a panel of three, then two, of the board's ability, authority to issue decisions under Section 10 that are legally binding on parties and can be enforced in a court. The regional director's decisions are representation decisions under Section 9. They cannot be enforced in court. They must be reviewed by the board before they become an enforceable or legally binding order. The board, in its discretion reviewing the act, does believe that to be a very different kind of order. I'm not sure why that makes a difference. You've recited that, well, the facts are different. But I'm not sure why that makes any difference. If the board cannot delegate authority that it does not have for lack of a forum, why does it matter whether the authority being delegated is to make a final decision or a reviewable decision? I think it does make a difference. Well, you started that claim that you think it does. I want to know what that difference is. Well, what the regional directors do is investigate and tee up cases for the board. So when there is an election petition, it is Congress's express intent that election petitions be held quickly. Yeah, and that's stipulation that we were talking about before. That's a board forum, isn't it? Well, Your Honor, it's a board forum. But in the Noel Canning era, companies did make challenges to regional director authority. That was added to stipulations and approved by you. They could have made, under the board's procedures, a challenge. I'm taking you off your point. Go back to your point. What was my point? No. The regional directors only tee up questions for the board to decide. They don't get to decide these issues themselves. Why does that matter in terms of whether the board can go get the authority? I understand the distinction. I'm not sure I understand why it makes a difference. And I've not yet heard you tell me anything that, in my mind at least, answers that question. The issue in Laurel Bay was the board's actions, the board acting. The regional director is getting things ready for the board to act. Nothing can become final until the board acts. As you know, many of our cases actually settle out. Elections happen or unfair labor practices happen. The regional offices handle them, and they settle. All that happens without the board's involvement. And under the purposes of the act, reducing labor strife, making sure that elections happen, unions lose, unions win, the votes can be counted by regional directors without going to the board. When there are problems, however, that goes to the board. And if the board has no quorum, the board can act, and those issues wait. But the investigation or the taking of evidence, that can happen without the board having to get involved. And that's why I think the delegations are very different. The Congress recognized in 59 the board doesn't need to be involved in most of these representation petitions. More than 90 percent of them go through the process without the board's involvement. I'd like to go back to the deference issue, the Chevron deference issue. Now, the view that the board is taking here on the delegated authority of the regional director, was that a view that emerged from the sort of formal process we typically require of Chevron deference? I thought it came, I thought it was announced in an opinion by the board. I mean, there was no notice and comment rulemaking or some sort of formal process. Don't we just, don't we typically reserve Chevron deference for opinions that emerge from a more formal process than was had here? I don't, in terms of rulemaking, I don't think so. I mean, I think Chevron deference can be applied to the board's interpretation of its statute. I may be wrong here, but I thought this view came out of an opinion of the board, that it wasn't part of a formal rulemaking process. It is not part of a rulemaking process. Well, the board doesn't do rulemaking, but it came in adjudication, right? It came out of adjudication. We do do rulemaking, but rarely. You didn't do rulemaking for many, many years. I think probably we ought to be glad you haven't gone back and done anything. Let me go back just a moment to the conduct of the election. Doesn't the statute say the board will conduct the election? So that anything the regional director does is by delegation? It is by delegation of the board. Right, because the board conducts the election, but they delegate that to the regional director. That is true. If they can't delegate, they can't conduct, can they? The delegation happened in 61 and has never been revoked. Okay. It has never been taken back. It just brings us back, I guess, to the issue. The essential question. Yes, sir. Does the board not ask for Chevron deference for its adjudications? Well, because of Section 10E of the Act, it says that questions of fact were resolved by substantial evidence. I mean, the language of the APA is in the Act, so we usually, I mean, that's our standard. On Chevron deference, as I understand, Chevron deference extends to adjudications, I believe. I think the Supreme Court said that in a year to year. Yes. And doesn't the board ask for Chevron deference, even though it's not engaged in formal rulemaking? It asks for Chevron deference when it announces some interpretation in an adjudication. When we're interpreting our statute. Did you think that's what you were doing here? You're asking for Chevron deference. We are asking for Chevron deference because we are interpreting Section 3B of the Act. Even though you're doing it in an adjudication, you're still asking for Chevron deference? Yes, Your Honor. And do you know of a reason that you can't get Chevron deference because your interpretation wasn't announced in an adjudication rather than in rulemaking? I know of no reason why we could not get Chevron deference. Could you address the subpoena issue, please? I know you're out of time, but we're not. Yes, Your Honor. In the subpoena, all they asked for was the number of phone records. How many times did these two people talk? It was already in evidence. What was already in evidence? That they had very frequent contact. But the issue really is I don't understand what the information would get them. I mean, after it's all over, the hearing officer found that Supervisor Macken engaged in coercive pro-union conduct. The board applies harborside. If the board had also found her to be an agent, the board would apply harborside. So I don't actually understand what the subpoena records would get them. So I didn't see that argument in your brief, and I think that's along the lines of the questions we were presenting to opposing counsel about whether there's a different prejudice inquiry. And is there a different prejudice inquiry, or is it the same prejudice inquiry? I don't think so. I mean, this issue where unions can pull employees, but they can't pull coercively. But here we've got a supervisor, the supervisory contact, and the board applies harborside in that case. And it's also a stringent standard. It's not a lower standard. We were talking about the bar to reach. The harborside bar is the same. In Miller Refrigerated Services, there was a supervisor acting as a union agent, and the board applied harborside. That's the standard the board applies. Thank you. We'll give you back two minutes for rebuttal only. Just on the last point counsel raised, I mean, if a supervisor is pulling coercively and she's acting as an agent of the union, then the agent is pulling coercively, and that is grounds for setting aside an election. We have a real concern with the NLRB and harborside. They're tipping their hat to the notion that pro-union supervisory conduct will be evaluated under the same tough standard as anti-union supervisory conduct, but that clearly is not what the board does. This case, and the court may have seen many cases where there's questions about supervisory status of the charge nurse. There's questions about whether she asked someone to sign a card. This has the strongest record of undisputed supervisory status and repeated efforts to get employees to sign cards. Does the subpoena question go to the coercive question? The subpoena question goes to the regularity of contacts between Mack and Welch. Right. Not the coercive question. How does that show that she did or did not coerce anybody if she talked to the union officer every day? It gives us the opportunity to show that her actions should be imputed to the union as an agent. Well, if it's not coercive, why does it matter? The hearing officer found it to be coercive. She just found mitigating circumstances. It's about the coercive finding if you get the subpoenaed record. We at least have the argument, Your Honor, that the union is engaging in the conduct as opposed to a third party engaging in the conduct, which is the distinction that Can I ask this question on that just really quickly? Why does it matter if the employees don't know that the union is engaging in the conduct? She, Ms. Mackin, told employees she was regularly meeting with the union agent and she's telling them who's voting yes and who's voting no and what the issues are, and he's giving her information to carry back. Right, but I guess my question is the frequency of contacts between Mackin and Welch, they don't shed light on the extent to which the employees would have assumed that Mackin is acting clothed with the union's authority, unless the employees know how often they're talking to each other. And the only evidence the employees would have would be the testimony of the employees that's on the record as to the frequency. So I don't understand how the subpoena information is adding to the argument, I guess. I believe the case is Ozark and Indiana Hospital say that it is prejudicial error just de facto for a board hearing officer to deny a subpoena for what would be relevant evidence. Maybe it turns out not to be. Yeah, that seems to be where we are as to whether the evidence is genuinely relevant in the sense of materially affecting the likelihood of a fact to be true. And as you referred, the hearing officer found mitigation. What about the subpoenaed evidence could possibly change the mitigation factor? It does not change the mitigation, Your Honor. And the mitigation goes to the coercion factor, right? Correct. If the mitigation factor is still the same and the coercion factor does not appear to be changing a great deal, what good would the evidence do you suggest? Why isn't it non-prejudicial, assuming an error, which it may be, why isn't it non-prejudicial? Because I believe the case is distinguished between Mackett as a third party or an employee engaging in bad acts and a party, the union, engaging in bad acts. Okay. And your point is you didn't get a chance to show that, right? We did not get a chance to show that all those acts should be attributed to a party, the union, and we believe the Ozark case and the Indiana Hospital case, which is cited, I believe, in Ozark, clearly state that we should have had that opportunity. But would it change the outcome if the hearing officer already looked at this and said, regardless, we saw what Mackett did and it did not affect the outcome. What difference does it make if we find out that Mackett was being paid by the union and on their payroll, hypothetical? What difference would that make? The hearing officer seemed to think it would make a difference. She paints us as not having produced a shred of evidence of agency status between Mackett and Welsh when she denied us the opportunity to get phone records that would have shown regularity of contact and frequency and duration of contact, which are clearly factors that are considered relevant under Ozark and Indiana Hospital to proving agency status. Thank you. Thank you very much. Case is submitted.
judges: Griffith, Srinivasan, Sentelle